**SIGNED THIS: September 21, 2021**

_____

**Mary P. Gorman
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No.     20-90547 |
| JEFFREY J. BENTLEY, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| CARRIE L. BOONE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No.     20-09014 |
| | ) | |
| JEFFREY J. BENTLEY, | ) | |
| | ) | |
| Defendant. | ) | |

## O P I N I O N

Before the Court, after trial, is a Complaint Objecting to Discharge of Debtor filed by Carrie L. Boone, the Debtor's ex-wife. The complaint alleges that the Debtor knowingly and fraudulently made false oaths in connection with his

bankruptcy case. Because Ms. Boone met her burden of proof on all elements of the cause of action, the Debtor's discharge will be denied.

## I.      Factual and Procedural Background

Jeffrey J. Bentley ("Debtor"), acting *pro se*, filed his voluntary Chapter 7 petition on June 11, 2020. At paragraph four on the petition—requiring disclosure of any business names he had used in the last eight years—the Debtor listed thirty business names under which he said he was doing business or had formerly done business. Relevant here, the names included: FDBA Bentley Builders Construction and Development Inc; DBA Bentley Holdings Bloomington, LLC; DBA Bentley Holdings Champaign, LLC; DBA Bentley Holdings Rochester, LLC; DBA Welbrook Bloomington Operating Company, LLC; DBA Welbrook Bloomington, LLC; DBA Carriage Crossing Champaign, LLC; FDBA Carriage Crossing Management LLC; FDBA Carriage Crossing A Randall Residence Bloomington, LLC; DBA Carriage Crossing a Randall Residence Champaign, LLC; FDBA Carriage Crossing Randall Residence Heyworth, LLC; FDBA Carriage Crossing Rochester, LLC; DBA Carriage Crossing Senior Life Inc.; FDBA Carriage Crossing Senior Living Addison, LLC; DBA Carriage Crossing Senior Living Arcola LLC; DBA Carriage Crossing Senior Living Decatur, LLC; FDBA Carriage Crossing Senior Living, LLC; DBA Carriage Crossing Senior Living LLC; DBA Carriage Crossing Senior Living Mundelein, LLC; DBA Carriage Crossing Senior Living Rochester, LLC; FDBA Carriage Crossing SL, LLC.

Following standard operating procedures, the Clerk of Court added the names of all of the entities into the caption of the Debtor's petition in the Court's electronic case filing ("ECF") system. Thus, a search for any of the names results in identification of the named entity as a debtor in the bankruptcy case.

The Debtor also listed several entities in an attachment to the voluntary petition for "Additional Sole Proprietorship(s)." The sole proprietorships listed included: Bentley Contractors Corp.; Bentley Holdings – Bloomington LLC; Bentley Holdings – Champaign LLC; Bentley Holdings Rochester, LLC; Welbrook Bloomington Operating Company; Welbrook Bloomington, LLC; Carriage Crossing Champaign, LLC; Carriage Crossing a Randall Residence (located in Champaign); Carriage Crossing Senior Life, Inc; Carriage Crossing Senior Living, Arcola; Carriage Crossing Senior Living Decatur; Carriage Crossing Senior Living LLC; Carriage Crossing Senior Living Mundelein; and Carriage Crossing Senior Living Rochester.

The Debtor did not include various required documents, such as a statement of financial affairs and the schedules, with his petition. After retaining an attorney and receiving multiple extensions of time, the missing documents were filed in late July 2020. On his Schedule A/B: Property, the Debtor listed several businesses in which he claimed an ownership interest. Relevant here, he described his business interests and the value of his interests as follows: "Bentley Builders Construction and Development Inc 50/50 with ex-wife Carry (sic) Boone," $0; "Carriage Crossing Senior Living

Arcola Inc. 50/50 owner with Ex-wife – owns 17% of Carriage Crossing Arcola Development," $350,000; "Bentley Holdings Champaign LLC – owns 30% of Carriage Crossing Champaign 50/50 with ex-wife," $900,000; "Bentley Holdings Bloomington Illinois LLC owns 28% of Wellbrook Senior Living LLC 50/50 with ex-wife," $1,200,000; "Carriage Crossing Senior Living Decatur LLC 50/50 with ex-wife," $500,000; "Carriage Crossing Senior Living Mundeline (sic) 50/50 with ex-wife," $2,000,000; "Carriage Crossing Senior Living Rochester 50/50 with ex-wife," $1,200,000.

The Debtor's ex-wife and business partner, Carrie Boone, filed her Complaint Objecting to Discharge of Debtor based on allegations of false oaths made in connection with the case. The complaint alleges that the Debtor misrepresented his ownership interests in a number of entities, many of which he had no direct interest in, for the purpose of harassing Ms. Boone and her business partners and to harm those businesses. The complaint also alleges that the Debtor falsely asserted that he was the sole proprietor of or did business as various entities in which he had no involvement beyond holding an indirect, minority interest. Further, the complaint alleges that the Debtor overstated his assets and falsely claimed that Ms. Boone had stolen property from him and owed him a substantial debt that was being litigated in marital dissolution proceedings in state court. In his answer to the complaint, the Debtor admitted the allegations related to what he had claimed in his bankruptcy papers but otherwise denied Ms. Boone's allegations of wrongdoing.

A Notice of Pretrial Conference and Pretrial Order was subsequently entered, setting a telephonic pretrial conference for early January 2021, directing the parties to complete their initial disclosures required by Federal Rule of Civil Procedure 26(a)(1), and ordering submission of a joint pretrial statement prior to the conference. Ms. Boone timely filed her pretrial statement with no apparent participation from the Debtor wherein she stated that she had complied with the Rule 26(a)(1) disclosure requirements. At the pretrial conference, the Debtor's attorney apologized for not complying with the pretrial order and asked for additional time to do so. The pretrial conference was continued for a week during which the parties filed their joint pretrial statement proposing a discovery deadline of March 31, 2021. The joint pretrial statement also noted that the Debtor had not yet complied with the Rule 26(a)(1) disclosure requirements but that he had agreed to do so by January 28, 2021. A trial order was then entered, adopting the proposed discovery deadline of March 31, 2021, and, by agreement of the parties, setting the matter for trial by video conference beginning June 8, 2021.

On March 8, 2021, Ms. Boone filed a Motion to Compel Rule 26 Disclosure reciting the history of the Debtor's failure to comply with the Court's pretrial orders and Rule 26(a)(1), as well as her attorney's efforts to obtain the required disclosures from the Debtor's counsel. She also filed a separate Motion to Compel Discovery, explaining that the Debtor had yet to respond to interrogatories and requests for production of documents that had been sent

on February 1, 2021. She claimed that the parties were not able to resolve the
discovery dispute despite the efforts of her attorney to do so.

After the discovery motions were filed by Ms. Boone, the Debtor's
attorney moved to withdraw from representing the Debtor and was allowed to
do so. During that same period of time, the Debtor apparently moved to Florida
and notices sent directly to him by the Clerk were being returned as
undeliverable. A hearing on the pending discovery motions was held April 7,
2021; the Debtor appeared at the telephonic hearing *pro se*. The Court
admonished the Debtor on his responsibility to provide a current, valid mailing
address and to comply with his discovery obligations. The Debtor was
specifically advised that, if he did not comply with discovery requests, he could
be barred from presenting evidence at the upcoming trial and ultimately be
denied his discharge. The matters were briefly continued to give the Debtor an
opportunity to retain new counsel.

The Debtor did retain new counsel, who appeared at the continued
hearing on the Debtor's behalf. The motions to compel were granted, and the
Debtor was ordered to fully comply with all disclosure requirements and
discovery requests by May 13, 2021, with a compliance status conference
scheduled for May 20, 2021. At the May 20 status conference, Ms. Boone's
attorney reported that the Debtor had failed to comply with the May 13
deadline and that the Debtor's new attorney contacted him for copies of the
discovery requests only after that deadline had passed. He said he then
received what he called "woefully inadequate" responses to the discovery

requests just that day. He still had not received the Rule 26(a)(1) disclosures and stated his intent to file a motion for sanctions. The Debtor's attorney acknowledged that his client had not fully complied with outstanding discovery requests and the Court's orders.

Shortly thereafter, Ms. Boone filed her Motion for Rule 37 Sanctions, reciting the history of the Debtor's failures to comply with discovery obligations and asking the Court to enter a default judgment against the Debtor or bar him from opposing her claims. The motion also sought an award of attorney fees. At a hearing held on the motion, the Debtor's attorney orally requested more time to comply and a continuance of the upcoming trial. But he failed to provide any credible excuse for the Debtor's previous failure to comply with his discovery obligations and, accordingly, an order was entered granting the motion, in part. As a sanction for his failure to cooperate in the discovery process, the Debtor was prohibited from presenting any witnesses, documents, or exhibits in his own defense. The prohibition explicitly did not extend to his ability to cross-examine witnesses offered by Ms. Boone but did extend to cross-examination based on any evidence that should have been previously produced by the Debtor. The request for entry of a default judgment was denied. The Court reserved ruling on the issue of awarding attorney fees.

The trial was held by video conference as scheduled. Ms. Boone's case consisted of testimony from five witnesses—two business associates, an accountant, the Debtor, and herself. The Debtor and his attorney were present throughout the trial. The Debtor's attorney cross-examined witnesses but,

because of the sanctions order, presented no affirmative evidence on behalf of the Debtor.

Gary Harvey was Ms. Boone's first witness, identifying himself as the vice president of finance, treasurer, and assistant secretary for AF Holding Co. He stated that the company's primary investment was in Agri-Fab, a manufacturer of lawn and garden equipment, but that it also held investments in various other business entities. Among those other investments were certain assisted-living facility projects through which he knew and dealt with Ms. Boone. Mr. Harvey also stated that he was acquainted with the Debtor through these business dealings because the Debtor was a general contractor who built buildings for some of the projects.

As to specific projects relevant here, Mr. Harvey identified Carriage Crossing Champaign, LLC, Carriage Crossing A Randall Residence – Champaign, LLC, and Carriage Crossing Senior Living – Arcola, LLC as being among AF Holding's investments. He identified a document titled Second Amended and Restated Operating Agreement of Carriage Crossing Senior Living – Arcola, LLC, which he said was the current operating agreement of that entity, effective as of June 26, 2019, and under which AF Holding was the managing member. Mr. Harvey said that, as a representative of the managing member, he had knowledge of the other members and ownership interests and that the Debtor did not hold a direct interest in Carriage Crossing Senior Living – Arcola, LLC. He did recognize, however, that the Debtor held an indirect 9.1% interest in the company through his joint ownership with Ms. Boone of

Carriage Crossing Senior Life Inc, which, according to the operating agreement, was a member of Carriage Crossing Senior Living – Arcola, LLC with an 18.2% ownership interest. He said that the Debtor was not the sole proprietor of Carriage Crossing Senior Living – Arcola, LLC. And, as far as Mr. Harvey knew, the Debtor was not doing business under the name of Carriage Crossing Senior Living – Arcola, LLC. He opined that legal recourse would be taken against the Debtor if he attempted to operate a business under that name.

Mr. Harvey also testified that Carriage Crossing Champaign, LLC and Carriage Crossing A Randall Residence – Champaign, LLC were the same company and that it had been renamed Carriage Crossing Champaign, LLC when the original managing member, Randall Holdings, LLC, divested. He identified a document titled Second Amended and Restated Operating Agreement of Carriage Crossing Champaign, LLC, with an effective date of June 12, 2019, under which this name change was recognized and Champaign R.E. Holdings, LLC was named as the managing member. Mr. Harvey stated that Champaign R.E. Holdings, LLC was owned by AF Holding Co. Membership of Carriage Crossing Champaign, LLC was comprised of two other members with a 30% stake, including Bentley Holdings – Champaign, LLC, an entity owned jointly by the Debtor and Ms. Boone. The Debtor therefore indirectly held a 15% ownership interest in Carriage Crossing Champaign, LLC. But, Mr. Harvey said, the Debtor was not the sole proprietor of Carriage Crossing Champaign, LLC or Carriage Crossing A Randall Residence – Champaign, LLC. And, to his knowledge, the Debtor was not and had not ever done business using the name

of either entity. He again opined that if the Debtor had done so, the managing member would have taken legal action to stop him.

Ms. Boone also called Dan Brewer as a witness. Mr. Brewer identified himself as the sole proprietor of Bridge Capital Management and the majority owner and fund manager of Senior Living Fund, LLC, an entity that invests in senior-housing developments across the United States. He said that he was familiar with Ms. Boone as he had worked on a number of investments with her through both Bridge Capital Management and Senior Living Fund and its affiliate entities. He said that he was also acquainted with the Debtor through his relationship with Ms. Boone.

Mr. Brewer identified Carriage Crossing Champaign, LLC as being among the investments he had worked on with Ms. Boone. He said that one or more of his companies made an investment in the Carriage Crossing Champaign facility through Bentley Holdings – Champaign, LLC, which held a 30% ownership interest in Carriage Crossing Champaign, LLC. According to Mr. Brewer, Senior Living Fund I, as well as another Bridge Capital Management fund, provided investment capital to Bentley Holdings – Champaign, LLC in exchange for an ownership interest in Carriage Crossing Champaign, LLC. He identified an April 2018 Pledge and Security Agreement between Bentley Holdings – Champaign, LLC and Senior Living Fund I, LLC wherein Bentley Holdings – Champaign, LLC pledged its 30% stake in the entity known at that time as Carriage Crossing A Randall Residence – Champaign, LLC to Senior Living Fund I as security for acquisition financing.

Mr. Brewer described Welbrook Bloomington Operating Company, LLC as being solely owned by Welbrook Bloomington, LLC, an entity of which he served as a manager and in which Senior Living Funds I, II, and IV held ownership interests. He said that the Debtor was not the owner of Welbrook Bloomington, LLC or Welbrook Bloomington Operating Company, LLC and was not doing business under either name. If the Debtor had done business using these entity names, legal action would have been taken against him. Mr. Brewer identified a document titled Third Amendment to Operating Agreement, which he said showed the breakdown of membership interests in Welbrook Bloomington, LLC. The agreement, admittedly made in July 2020—after the Debtor's bankruptcy filing, recognized Senior Living Fund IV's purchase of certain departing members' ownership interests and Dan Brewer's appointment as manager. Among the other membership interests set forth, Bentley Holdings – Bloomington, LLC was shown to hold a 25% interest in Welbrook Bloomington, LLC as a Class A member and another 4.74% as a Class B member. Because Bentley Holdings – Bloomington, LLC was jointly owned by the Debtor and Ms. Boone, the Debtor indirectly held a less-than 15% interest in Welbrook Bloomington, LLC. Mr. Brewer admitted on cross-examination that the Debtor had not signed the Third Amendment to Operating Agreement and that the membership interests could have been different prior to that agreement. He later asserted, however, that the ownership interests had not changed since the company's inception.

Mr. Brewer also said he was familiar with Carriage Crossing A Randall Residence – Bloomington, LLC, explaining that it was the entity and name under which the "Bloomington facility" operated until Senior Living Fund bought out the Randalls. He did not say whether the "Bloomington facility" was in reference to the facility affiliated with the Welbrook name or a distinct operation.

Mr. Brewer testified as to Carriage Crossing Senior Living Decatur, LLC, which he said was initially owned 100% by Bridge Capital Management. Per the 2018 Operating Agreement identified by Mr. Brewer, Ms. Boone, individually, was named manager of Carriage Crossing Senior Living Decatur, LLC. In November and December 2020, Mr. Brewer explained, the company went through changes in management, membership, and corporate form. Ms. Boone was removed as manager. New members were added, including BNB Decatur, LLC, a company apparently owned solely by Ms. Boone. The company also changed its form and redomesticated as a Delaware statutory trust. Mr. Brewer stated that the Debtor himself was never a member of the company in any of its forms but admitted that he did not know whether the Debtor had ever been a member of BNB Decatur, LLC. He said that, to his knowledge, the Debtor was not doing business as Carriage Crossing Senior Living Decatur, LLC or any of its subsequent corporate forms. If the Debtor were doing business under those names, legal action would be taken to stop him.

Mr. Brewer also described Carriage Crossing Senior Living Mundelein, LLC as a company owned solely by Bridge Capital Management and managed

by Ms. Boone. He said that the Debtor was not an owner of and was not doing business as Carriage Crossing Senior Living Mundelein, LLC or else legal action would be taken against him.

Finally, Mr. Brewer testified that he was familiar with Carriage Crossing Rochester, LLC and Carriage Crossing Senior Living Rochester, LLC; the former being the prior name of the latter. He said the company changed its name to Carriage Crossing Senior Living Rochester, LLC sometime in 2018. Mr. Brewer said that Senior Living Fund V USA, LLC invested significant capital and was the majority owner of the company, with Bentley Holdings – Rochester, LLC holding a 10% membership interest. Ms. Boone and an individual named Ted Lung were also each given a 3% stake in the company in exchange for their personal guaranties of company debt. Mr. Brewer acknowledged the Debtor's indirect 5% interest in the company through his joint ownership of Bentley Holdings – Rochester, LLC with Ms. Boone. Mr. Brewer said that the Debtor was not doing business as Carriage Crossing Senior Living Rochester, LLC or Carriage Crossing Rochester, LLC, and, if he were, legal action would be taken against him.

Kim Martin, a certified public accountant and member of Martin Hood LLC, testified next for Ms. Boone. He identified himself as the longtime accountant for the Debtor, Ms. Boone, and their several business entities. During pretrial proceedings, Ms. Boone's attorney had said that the Debtor's accountant would be called as a witness to establish that the Debtor's repeated representations that his 2018 and 2019 tax returns were in the process of

being completed were false statements. Ms. Boone's attorney also docketed, as potential exhibits for trial, transcripts of creditors meetings held August 13, 2020, September 10, 2020, October 29, 2020, December 3, 2020, January 28, 2021, February 17, 2021, March 9, 2021, and April 2, 2021.

Ms. Boone's attorney began his questioning of Mr. Martin by asking him to read from one of the creditors meeting transcripts. Notwithstanding the lack of any objection by the Debtor's attorney, the Court interrupted to inquire where the testimony was going and under what circumstances Mr. Martin's reading from the transcripts would form a basis for the Court to consider whatever he read as evidence. Ms. Boone's attorney said that the transcripts were admissible as the record of a proceeding pursuant to Federal Rule of Bankruptcy Procedure 5007. The Court responded that a creditors meeting is not a proceeding before the Court subject to Rule 5007 but, rather, a meeting called by the United Sates Trustee outside of the Court's presence and that the transcripts marked as exhibits were created by someone listening to recordings of the meetings rather than by someone charged with taking an official record as contemplated by Rule 5007.

Ms. Boone's attorney next argued that the Court could take judicial notice of the transcripts pursuant to Federal Rule of Evidence 201. He could not, however, explain how Mr. Martin's reading of the transcripts into the record would provide the foundation necessary for the Court to take judicial notice. The substantive information in the transcripts was not of the type generally known, and it was not information that the Court could readily and

unquestionably determine to be accurate without the testimony of further witnesses. Likewise, it remained unclear how Mr. Martin's reading of the transcripts would be affirmative evidence of anything.

Finally, Ms. Boone's attorney argued that the creditors meeting transcripts were admissible because the Debtor's statements at his creditors meetings were not hearsay pursuant to Federal Rule of Evidence 801(d). The Debtor's attorney objected at this point, arguing that, although the statements of the Debtor might not be hearsay if introduced by someone who had attended the meeting, the statements could not be introduced by someone who did not attend and had no personal knowledge of what was said at the meeting. The Court agreed, stating that the fact that a statement may not be hearsay does not make the statement admissible without a proper foundation being laid. Ms. Boone's attorney then abandoned the line of questioning, moving on to ask Mr. Martin questions within the scope of his own knowledge.

Mr. Martin acknowledged that Martin Hood LLC had received a subpoena for records from Ms. Boone's attorney relating to the Debtor and confirmed that his firm had provided copies of all records responsive to the subpoena. Mr. Martin admitted that he did not recall the exact scope of the subpoena or how far back in time the request encompassed. He acknowledged that the affidavit regarding the records provided was made by Anthony Pendleton, a former employee no longer associated with the firm.

Referring to the records that his firm had provided, Mr. Martin said that the Debtor first contacted Martin Hood about working on his 2018 and 2019

tax returns in November 2020. Mr. Martin acknowledged that the Debtor might have contacted him or his former associate, Mr. Pendleton, before then, but he also stated that his firm had not begun any work and did not have the information needed to do the work at that time. By the end of January 2021, significant information was still needed to complete the Debtor's 2018 and 2019 taxes. Mr. Martin said that the only work that might have been done by that point was the sorting and migrating of the information received from the Debtor into the firm's system in anticipation of receiving the outstanding information. By March 2021, the firm was still lacking the information it needed to complete the Debtor's tax returns but had begun working on them. Mr. Martin estimated that the returns were about 10% complete by then. As of the day of trial, Mr. Martin said that additional information was still needed and estimated that the returns were only 25-30% complete.

The Debtor was called to testify as to statements he made at the several creditors meetings. He did not dispute attending multiple meetings in late 2020 and early 2021. He admitted that, at one or more of those meetings, he told the case trustee that Martin Hood was working on his 2018 and 2019 taxes. He said that he had spoken with Mr. Pendleton by telephone in July 2020 and that Mr. Pendleton started working on the returns then. The Debtor admitted that, at the meeting held in December 2020, he told the trustee that he had spoken with Mr. Martin and that his taxes were "a little over halfway done" at that time. He also did not dispute telling the trustee at a meeting of creditors held in

February 2021 that he had provided Martin Hood with all the information needed to complete his 2018 and 2019 taxes.[1]

Finally, Ms. Boone testified on her own behalf. She said that she was married to the Debtor from 2012 to 2019; the couple separated in the fall of 2018. Although a dissolution of their marriage had occurred, the two were still involved in litigation regarding the division of property, including their various business interests. Ms. Boone said that her occupation was to manage assisted-living operations. She held ownership interests in many of those operations, either individually or through one of several companies that she owned jointly with the Debtor.

Of the companies that she owned jointly with the Debtor, Ms. Boone described Bentley Builders Construction and Development LLC, Bentley Holdings – Bloomington, LLC, Bentley Holdings – Champaign, LLC, Bentley Holdings – Rochester, LLC, and Carriage Crossing Senior Life Inc as being owned by them as "50/50" partners. She identified past tax documents reflecting their "50/50" status for Bentley Holdings – Rochester, LLC, Bentley Holdings – Champaign, LLC, and Carriage Crossing Senior Life Inc. They had filed joint tax returns until they separated in 2018. She said that, without question, the Debtor was never the sole proprietor of the jointly-owned companies. She identified the operating agreement of Bentley Holdings – Bloomington, LLC, which showed both herself and the Debtor as managers, but she did not expound on their roles in the other jointly-owned companies and

---

[1] The Debtor testified without reference to the transcripts of the creditors meetings. The transcripts were never offered or admitted into evidence and have not been considered by the Court in rendering this Opinion.

was unsure where operating agreements for those companies were located or whether they ever even existed.

Ms. Boone identified several ventures that she, and in some cases the Debtor, was involved with either individually or indirectly through other entities. She said she was familiar with Welbrook Bloomington Operating Company, LLC as being owned by another entity, Welbrook Bloomington, LLC, which, in turn, was owned in part by Bentley Holdings – Bloomington, LLC. Although the Debtor did have an interest in the company through Bentley Holdings – Bloomington, LLC, Ms. Boone said that he had never done business as Welbrook Bloomington Operating Company, LLC or Welbrook Bloomington, LLC. She identified the Third Amendment to the Operating Agreement of Welbrook Bloomington, LLC and opined that the Debtor surely would have gotten a copy of it or it would have at least been made available to him.

Carriage Crossing A Randall Residence – Bloomington, LLC was described by Ms. Boone as a company that she and the Debtor, through Bentley Holdings – Bloomington, LLC, started with CC Randall Holdings LLC, but the venture never went anywhere and was dissolved without ever operating.[2] She said that the Debtor was not doing business as Carriage Crossing A Randall Residence – Bloomington, LLC and identified secretary of

---

[2] When asked whether the company ever started operating, Ms. Boone responded, "Not as Carriage Crossing A Randall Residence, no."

state records showing Bentley Holdings – Bloomington, LLC and CC Randall Holdings LLC as the company's managing members.[3]

Ms. Boone also said that she was familiar with Carriage Crossing Champaign, LLC, describing it as an assisted-living operation that Bentley Builders Construction and Development LLC helped build and held an ownership interest in. She later testified, however, that Bentley Builders Construction and Development LLC was only hired as general contractor to build certain facilities and did not own any part of the entities for which the buildings were built. Instead, she said that Bentley Holdings – Champaign, LLC held an interest in Carriage Crossing Champaign, LLC and acknowledged the Debtor's indirect interest in that entity. Ms. Boone also identified Carriage Crossing A Randall Residence – Champaign, LLC as the former owner and operator of the project that was dissolved and replaced by Carriage Crossing Champaign, LLC. She said that the Debtor was not doing business as Carriage Crossing Champaign, LLC or Carriage Crossing A Randall Residence – Champaign, LLC.

Carriage Crossing Randall Residence – Heyworth, LLC was described as an entity formed to potentially open an assisted-living facility in Heyworth, Illinois, but, according to Ms. Boone, a decision was ultimately made not to build the facility.[4] She said the company never really did anything and no

---

[3] On cross examination, Ms. Boone said that she and the Debtor were part owners of Carriage Crossing A Randall Residence – Bloomington, LLC through Bentley Holdings – Champaign, LLC.

[4] While questioning Ms. Boone, her attorney inexplicably began referring to "Carriage Crossing Heyworth" as opposed to "Carriage Crossing Randall Residence – Heyworth" or the like. Given the number of entities with related names at issue, it is unclear to the Court whether the distinction is of any consequence.

longer existed. Ms. Boone also said that the Debtor did not do business as Carriage Crossing Heyworth, but later said, in response to a question about who owned the company, "it was Bentley and the Randalls."

Ms. Boone identified Carriage Crossing Rochester, LLC as a senior-living facility in Rochester, Illinois. She stated that she and the Debtor held an interest in the entity through Bentley Holdings – Rochester, LLC but that the Debtor was not doing business under that name. She separately described Carriage Crossing Senior Living Rochester, LLC as another assisted-living operation of which she and the Debtor were part owners through Bentley Holdings – Rochester, LLC. Again, she said that the Debtor did not do business as Carriage Crossing Senior Living Rochester.

Carriage Crossing Senior Living Addison, LLC was identified by Ms. Boone as "another LLC we formed that never went nowhere." She described the entity as "nothing" that "owns nothing." She said that Carriage Crossing Senior Living Addison, LLC was not in existence and that the Debtor did not do business as or have any ownership interest therein. But she also testified that she did not know who the owners were and would have to look at the records. When asked if she held any ownership interest in the LLC, she said that she did not believe that she did.

Ms. Boone described Carriage Crossing Senior Living Arcola as an assisted-living operation in Arcola, Illinois. She acknowledged that the Debtor indirectly owned part of the entity through their joint ownership of Carriage

Crossing Senior Life Inc. But she said that the Debtor did not do business as Carriage Crossing Senior Living Arcola.

Ms. Boone also said she was familiar with Carriage Crossing Senior Living Decatur, LLC, another assisted-living community. She said that neither she nor the Debtor held an ownership interest in the entity and that the Debtor did not do business as Carriage Crossing Senior Living Decatur. She further identified Carriage Crossing Senior Living Mundelein, LLC as merely a "potential site for another assisted-living" facility. She said that neither the Debtor nor herself have ever owned any part of the entity and that the Debtor did not do business under that name.

Finally, Ms. Boone identified screen shots of text messages sent to her from the phone number associated with the Debtor that she said she received in March and April 2019. In those messages, the Debtor claimed to have found a way to "stop everyone (sic) of your jobs and get half the management fees." He texted to her, "I'm going to file bankruptcy on everything of which you own half so it will affect you as well, then I'm going after you and Dan. . . . I have all the documents I need to go after you and Dan and I'll bury your jobs." Ms. Boone said that she understood "Dan" to be in reference to Dan Brewer.

Asked why she filed this adversary, Ms. Boone said that she felt she needed to protect her business partners and her companies from damage caused by the Debtor's false statements. She said her businesses had been affected in their ability to establish and maintain business partners and that the Debtor's actions impacted the companies' abilities to obtain financing. She

also said that she had closed business checking accounts that the Debtor's name was on out of fear that he would take the money.

Ms. Boone further denied stealing any jewelry from the Debtor and said that she did not owe him any money. To the contrary, she said that the state court presiding over their dissolution of marriage had ordered him to pay her attorney's fees of $17,000.

Both attorneys presented arguments at the close of evidence. The matter is ready for decision.

## II.    Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). Objections to discharge are core proceedings. 28 U.S.C. §157(b)(2)(J). The issues before the Court arise from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

## III.    Legal Analysis

*A. The imposition of Rule 37 sanctions against the Debtor was proper.*

Before addressing the substantive issues before the Court, a review of the imposition of sanctions on the Debtor for his failure to cooperate in the

discovery process is appropriate. Undoubtedly, the Debtor's ability to put forth a defense against Ms. Boone's claims was limited. But that consequence was a direct result of his failure to participate in the discovery process and comply with this Court's orders.

In October 2020, the Court entered its initial notice of pretrial conference and order directing the parties to exchange initial disclosures required by Rule 26(a)(1) and to submit a joint pretrial statement in anticipation of the January 2021 conference. When it became apparent at the January conference that the Debtor had not complied with his obligations under the pretrial order, he was given additional time to do so. But, even after the parties submitted and the Court adopted their joint pretrial statement proposing a March 31 discovery deadline and January 28 deadline for the Debtor to make his Rule 26(a)(1) disclosures, the Debtor failed to make the required disclosures and failed to participate in the discovery process in any meaningful way.

By March, the Debtor had still not complied with his disclosure obligations and had not responded to written discovery from Ms. Boone, prompting her to seek an order compelling the Debtor's compliance. And despite such an order being entered, setting a deadline for the Debtor to provide responses to all outstanding discovery requests and comply with all other discovery requirements, the Debtor still did not comply. Just days away from trial and without any disclosures or meaningful discovery responses from the Debtor, Ms. Boone had no option other than to seek sanctions.

Throughout the pretrial phase of this proceeding, the Debtor refused to provide any discoverable information, his obligations under the Rules and this Court's several orders notwithstanding. Of course, the Debtor did change attorneys in the process, but that does not excuse his wholesale lack of participation in the proceeding. The Debtor's pretrial obligations were made clear to both of his attorneys, as well as the Debtor himself, throughout the process. No credible excuse or justification was ever offered; the Debtor gave repeated promises of compliance that were never fulfilled.

Federal Rule of Civil Procedure 37, applicable in bankruptcy proceedings through Federal Rule of Bankruptcy Procedure 7037, provides for a variety of sanctions to remediate failures to cooperate in the pretrial discovery process, including dismissal or the entry of a default judgment against the offending party. Fed. R. Civ. P. 37(b)(2)(A). Such sanctions are appropriate when noncompliance is due to the willfulness, bad faith, or other fault of the disobedient party beyond simply being unable to comply with a discovery order. *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 640 (1976) (citations omitted). Here, the Debtor never raised any issue about his ability to comply; he repeatedly promised he would comply but never made any meaningful effort to do so. Taken as a whole, the Debtor's conduct in failing to comply with his discovery obligations under the Rules and this Court's orders over the course of this proceeding can only be construed as willful and in bad faith. The sanctions imposed were responsive to the offense; the Debtor failed to produce documents and disclose witnesses, so he was prohibited from

presenting such evidence at the trial. Ms. Boone was still required to prove the elements of her cause of action. Thus, the sanctions imposed were both necessary and appropriate under the circumstances.

## B. The Debtor's discharge must be denied.

Section 727(a) provides for the denial of a debtor's discharge if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account[.]" 11 U.S.C. §727(a)(4)(A). "The purpose of §727(a)(4) is to ensure that the debtor provides dependable information to those who are interested in the administration of the bankruptcy estate." *Clean Cut Tree Serv., Inc. v. Costello (In re Costello)*, 299 B.R. 882, 899 (Bankr. N.D. Ill. 2003) (citations omitted); *see also In re Khalil*, 379 B.R. 163, 172 (B.A.P. 9th Cir. 2007) (citations omitted) ("The fundamental purpose of §727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations."); *Buckeye Retirement Properties of Indiana, LLC v. Tauber (In re Tauber)*, 349 B.R. 540, 560 (Bankr. N.D. Ind. 2006).

The denial of a debtor's discharge is a harsh penalty, however, and the provisions of §727 must therefore be strictly construed against the objector and liberally construed in favor of the debtor. *Norton v. Cole (In re Cole)*, 378 B.R. 215, 221 (Bankr. N.D. Ill. 2007) (citations omitted). Yet a discharge in bankruptcy is not a right but rather a privilege reserved only for the "honest but unfortunate debtor." *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998) (quoting *Grogan v. Garner*, 498 U.S. 279, 287 (1991)).

A plaintiff bears the burden of proof that a debtor's discharge should be denied by a preponderance of the evidence. *In re Kempff*, 847 F.3d 444, 447 (7th Cir. 2017). To meet the burden, proof of five elements must be established: "(1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011) (citations omitted). Ms. Boone seeks denial of the Debtor's discharge here based on allegations that he made false oaths by misrepresenting his business interests on his bankruptcy paperwork and by making false statements at his creditors meetings regarding the preparation of his tax returns. 11 U.S.C. §727(a)(4)(A). At trial, Ms. Boone largely abandoned the allegations in her complaint regarding the Debtor's allegedly false statements that Ms. Boone stole jewelry from him and owed him significant amounts of money.

### 1. Statements Made Under Oath.

Ms. Boone easily satisfied the first element of her required proof—that the statements made by the Debtor at issue here were made under oath. "For purposes of §727(a)(4)(A), a debtor's petition and schedules, statement of financial affairs, statements made at a §341 creditor's meeting, and testimony given at a Rule 2004 examination all constitute statements that are made under oath." *John Deere Co. v. Broholm (In re Broholm)*, 310 B.R. 864, 880 (Bankr. N.D. Ill. 2004) (citation omitted). At issue here are the Debtor's

statements made in his petition and schedules and at his creditors meetings, all of which were admittedly made under oath.

## *2. The Falsity of the Debtor's Statements.*

The second element of required proof is that the Debtor's statements complained about by Ms. Boone were actually false. Ms. Boone complains about false statements made on the Debtor's paperwork and false statements made at the creditors meetings. Each will be discussed.

### a. The Debtor's Petition and Related Documents

On his petition, the Debtor stated that he did business as "Carriage Crossing Senior Living Mundelein, LLC," also claiming in the attachment to the petition that he was the sole proprietor of "Carriage Crossing Senior Living Mundelein." On his schedules, he asserted 50% ownership of "Carriage Crossing Senior Living Mundeline (sic)" valued at $2,000,000. The Debtor also stated on his petition that he was doing business as "Carriage Crossing Senior Living Decatur, LLC," identifying "Carriage Crossing Senior Living Decatur" as his sole proprietorship in the attachment to the petition. He further stated on his schedules that he owned "Carriage Crossing Senior Living Decatur LLC" with Ms. Boone as "50/50" partners, valuing his interest at $500,000. Contrary to these assertions, the Debtor neither owned nor did business as Carriage Crossing Senior Living Mundelein, LLC or Carriage Crossing Senior Living Decatur, LLC.

Dan Brewer, as the sole proprietor of Bridge Capital Management, testified that Carriage Crossing Senior Living Mundelein, LLC was a company owned solely by Bridge Capital Management and managed by Ms. Boone. He said that the Debtor held no ownership interest in the company, directly or indirectly. His testimony was corroborated by Ms. Boone, who said that neither she nor the Debtor have ever owned any part of Carriage Crossing Senior Living Mundelein. Mr. Brewer also testified that Carriage Crossing Senior Living Decatur, LLC was initially owned solely by Bridge Capital Management but subsequently went through several changes in not only management and membership but also corporate form. While Ms. Boone did serve as a manager of the Decatur operation for a period and later acquired a minority membership interest through another entity, BNB Decatur, LLC, both she and Mr. Brewer testified that the Debtor did not have any interest in Carriage Crossing Senior Living Decatur.[5]

Without question, the Debtor's assertions that he did business as and was the owner and sole proprietor of Carriage Crossing Senior Living Mundelein, LLC and Carriage Crossing Senior Living Decatur, LLC were false. He had no connection to the entities despite stating under oath on his petition that he did business as such entities.

The Debtor made similar assertions that he was doing business as sole proprietor of several other entities in which he held only an indirect, minority interest. On his voluntary petition, the Debtor stated that he did business as

---

[5] To be sure, the Debtor has never claimed, on his petition or otherwise, that he held an interest in BNB Decatur, LLC.

"Carriage Crossing Champaign, LLC" and "Carriage Crossing a Randall Residence Champaign, LLC." He also listed both as his sole proprietorships in an attachment to the petition. These assertions grossly misrepresented the Debtor's interest in those entities.

Gary Harvey, as representative of the parent company of the managing member of Carriage Crossing Champaign, LLC, testified that Carriage Crossing Champaign, LLC was the successor entity to Carriage Crossing A Randall Residence – Champaign, LLC, neither of which were the Debtor's sole proprietorship. He acknowledged that the Debtor held an indirect, minority interest in Carriage Crossing Champaign, LLC through his joint ownership of one of its members, Bentley Holdings – Champaign, LLC, a 30% stakeholder in the company. Dan Brewer further testified that the 30% interest held by Bentley Holdings – Champaign, LLC had been assigned to companies owned by him in exchange for acquisition financing while the entity was still operating as Carriage Crossing A Randall Residence – Champaign, LLC. Simply put, the Debtor's indirect 15% interest in Carriage Crossing Champaign, LLC and its predecessor, does not support his assertion that he was doing business under either name as a sole proprietor. The Debtor's misrepresentations about his interest in the Champaign entities constitute false statements made under oath.

The Debtor also stated on his petition and the attachment thereto that he did business as "Carriage Crossing Senior Living Arcola LLC" and that he was the sole proprietor of "Carriage Crossing Senior Living, Arcola." On his

schedules he stated that he owned "Carriage Crossing Senior Living Arcola Inc." with Ms. Boone as "50/50" partners, which, in turn, owned "17% of Carriage Crossing Arcola Development." He valued his property interest at $350,000. On the surface, the Debtor's assertions that he was the sole proprietor as well as 50% owner of Carriage Crossing Senior Living Arcola were inconsistent. But both were also false.

Gary Harvey, as representative of the managing member of Carriage Crossing Senior Living – Arcola, LLC, testified that the company was not the sole proprietorship of the Debtor and that the Debtor owned only an indirect, minority stake in the company through his joint ownership of Carriage Crossing Senior Life Inc, the holder of an 18.2% membership interest in Carriage Crossing Senior Living – Arcola, LLC. His testimony was corroborated by corporate records and the testimony of Ms. Boone. The Debtor clearly misrepresented his interest in and association with Carriage Crossing Senior Living – Arcola, LLC, and those misrepresentations constitute false statements made under oath.

The Debtor also stated in his petition that he formerly did business as "Carriage Crossing Rochester, LLC" and that he was doing business under the name "Carriage Crossing Senior Living Rochester, LLC." In the attachment to the petition, the Debtor asserted that "Carriage Crossing Senior Living Rocheste (sic)" was his sole proprietorship. On his schedules, he stated that he owned "Carriage Crossing Senior Living Rochester" with Ms. Boone as "5050" partners, valuing his interest at $1,200,000. Those assertions too were false.

Mr. Brewer, as manager of Carriage Crossing Senior Living Rochester, LLC and representative of the controlling membership interest, testified that the Debtor indirectly held a 5% interest in Carriage Crossing Senior Living Rochester, LLC—the entity that replaced the former Carriage Crossing Rochester, LLC—through his interest in Bentley Holdings – Rochester, LLC. Mr. Brewer's testimony was corroborated by corporate records and the testimony of Ms. Boone. This evidence contradicts the Debtor's assertions that he was both the sole proprietor of and 50% owner doing business under the same name. The Debtor clearly misrepresented the extent of his interest in Carriage Crossing Senior Living Rochester, LLC, and those misrepresentations constitute false statements made under oath.

Finally, the Debtor stated in his voluntary petition that he formerly did business under the name "Carriage Crossing a Randall Residence Bloomington, LLC" and was doing business as "Welbrook Operating Company, LLC" and "Welbrook Bloomington, LLC." He further identified "Welbrook Bloomington, LLC" as his sole proprietorship in an attachment to the petition.

Contrary to the Debtor's assertions, Mr. Brewer testified that he served as a manager of Welbrook Bloomington, LLC as well as the manager of the company's largest membership interest. He further testified that Welbrook Bloomington Operating Company, LLC was owned solely by Welbrook Bloomington, LLC. As such, he stated that the Debtor was not the owner of Welbrook Bloomington, LLC or Welbrook Bloomington Operating Company, LLC and was not doing business under either name. He did, however,

acknowledge that the Debtor held an indirect, minority interest in Welbrook Bloomington, LLC through his 50% ownership in another entity with a minority stake in the company. The Debtor's indirect, minority interest in Welbrook Bloomington, LLC notwithstanding, he clearly misrepresented his role or association with the Welbrook Bloomington entities. Those misrepresentations constitute false statements under oath.

### b. The Debtor's Creditors Meeting Testimony

Ms. Boone presented some evidence at trial related to statements the Debtor made at his creditors meetings regarding the preparation of his 2018 and 2019 tax returns. As the Debtor's attorney noted in his closing arguments, however, Ms. Boone's complaint contains no allegations as to the Debtor's 2018 and 2019 taxes or his testimony at the meetings. And although, in the parties' joint pretrial statement, Ms. Boone did refer to false statements made at the creditors meetings, there was no reference to the Debtor's tax returns.[6]

Allegations of fraud must be stated with particularity in the complaint. *See* Fed. R. Bankr. P. 7009; *TLR Coffee House, Inc. v. Cooper (In re Cooper)*, 399 B.R. 637, 645 (Bankr. E.D. Ark. 2009). Ms. Boone first identified Kim Martin as a witness on her list of witnesses and exhibits filed the week before trial in accordance with this Court's procedures. There, the stated purpose of Mr. Martin's testimony, while broad enough to encompass the testimony that was elicited at trial, gave the impression that Mr. Martin's testimony regarding the

---

[6] Indeed, the only factual contentions Ms. Boone said the creditors meeting testimony would be used to establish related to allegations of the disposition of certain assets.

Debtor's taxes would be used to show the true nature of the Debtor's business interests.[7]

Federal Rule of Civil Procedure 15, as made applicable here by Bankruptcy Rule 7015, does provide for the amendment of pleadings to conform to the proof when issues are tried by the implied consent of the parties and no objection is raised. The Court cannot say, however, that this standard should apply here. But a complete discussion of the issue is not warranted here because Ms. Boone failed to meet her burden of proof that the statements made by the Debtor at the creditors meetings regarding his tax returns were false.

The Debtor apparently testified at some length during the several creditors meetings regarding the preparation of his 2018 and 2019 taxes.[8] In his testimony at trial, the Debtor did not refute his testimony at those creditors meetings held in late 2020 and early 2021 and acknowledged telling the trustee at the time that, based on his conversations with firm associate Anthony Pendleton, Martin Hood was working on his 2018 and 2019 taxes. He also conceded telling the trustee that he had provided Martin Hood with all the information necessary to complete the tax returns and that Mr. Martin had told him that, by the end of 2020, the taxes were "a little over halfway done."

---

[7] As discussed *supra*, Ms. Boone's attorney did mention, during a pretrial hearing on the Motion for Rule 37 Sanctions, that he had subpoenaed the Debtor's accountant to potentially testify as to what accounting work he had done regarding the Debtor's 2018 and 2019 tax returns.

[8] The Court did not consider the transcripts of those meetings as they were not offered or admitted into evidence at the trial. As discussed *supra*, the Debtor's attempt to bring the substance of the transcripts into evidence through the testimony of Kim Martin was curbed by the Court's finding that Mr. Martin lacked any foundation to testify as to what occurred at the creditors meetings that he did not attend.

Kim Martin testified that, according to the records provided in response to the subpoena issued in this matter, the Debtor first contacted Martin Hood about his 2018 and 2019 taxes in November 2020, but he also acknowledged that the Debtor may have contacted him or Mr. Pendleton before then. Mr. Martin also said that, as of January 2021, his firm may have started preliminary work on the Debtor's tax returns but significant information was still needed to do substantive work. As of the day of trial, Mr. Martin estimated that the returns were only 25-30% complete and that the firm still did not have all the information it needed to finish the work.

The Court cannot say that the Debtor made false statements at his creditors meetings. The testimony elicited from the Debtor regarding whether his taxes were being completed by Mr. Martin and his firm was highly subjective. He said he believed he had provided all the information needed to complete the work, Mr. Martin's testimony notwithstanding. He also said that Mr. Martin told him that the taxes were halfway done; Mr. Martin did not refute this even though he did say that the taxes were no more than 30% complete as of the day of trial. In addition, Mr. Martin could not speak to the words and actions of his associate, Mr. Pendleton, who did much of the work on the Debtor's taxes and handled Martin Hood's response to the subpoena for the firm's business records but is no longer with the firm.

Ms. Boone did not meet her burden of establishing that the Debtor's statements at his creditors meetings were false. The other elements of required

proof will not therefore be discussed as pertaining to the Debtor's statements made at his creditors meetings.

### 3. Knowledge and Fraudulent Intent.

The third and fourth elements of required proof are that the Debtor knew his statements were false and made the false statements with fraudulent intent. Knowledge and intent are often intertwined. "A statement is considered to have been made with knowledge of its falsity if it was known by the debtor to be false, made without belief in its truth, or made with reckless disregard for the truth." *Pergament v. Gonzalez (In re Gonzalez)*, 553 B.R. 467, 474 (Bankr. E.D.N.Y. 2016) (citation omitted). "[N]ot caring whether some representation is true or false—the state of mind known as 'reckless disregard'—is, at least for purposes of the provisions of the Bankruptcy Code governing discharge, the equivalent of knowing that the representation is false and material." *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998) (citations omitted).

A debtor's fraudulent intent can be shown through intentional misrepresentations or a reckless disregard for the truth. *Stamat,* 635 F.3d at 982. Absent actual intent to defraud, "[t]he cumulative effect of multiple false statements may evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent." *Gargula v. Baker (In re Baker)*, 2020 WL 7767853, *11 (Bankr. C.D. Ill. Dec. 29, 2020) (citing *Stamat*, 635 F.3d at 982 (explaining that, while over-reporting one's income does not itself amount to fraudulent intent, it could rise to that level if part of a larger picture of errors)).

In bankruptcy law, intent to defraud or deceive does not require an intent to obtain a pecuniary benefit. *In re Katsman*, 771 F.3d 1048, 1050 (7th Cir. 2014) (citations omitted). "Courts have found the requisite intent to act 'knowingly and fraudulently' . . . where the debtor's conduct was evasive or persistently uncooperative." *Gargula v. Delagrange (In re Delegrange)*, 2018 WL 4440657, at *5 (Bankr. S.D. Ill. Sept. 14, 2018) (citations omitted).

Here, the Debtor made multiple false statements on his petition and schedules. The most egregious of them involved purported business interests of apparently significant value that were nonexistent or grossly overstated. For instance, the scheduled value of the Debtor's claimed interest in Carriage Crossing Senior Living Arcola, Carriage Crossing Senior Living Decatur, Carriage Crossing Senior Living Mundelein, and Carriage Crossing Senior Living Rochester totaled more than $4 million. Other entities that the Debtor claimed to do business as were conspicuously omitted from his Schedule A/B: Property. The Debtor's bankruptcy paperwork is rife with errors.

The Court finds it inconceivable that the Debtor did not know what his actual interest was in the various, and apparently quite valuable, business entities he listed on his petition and schedules as being his own, or that he did not know that he did not do business under many of those names. The testimony was that the Debtor was a building contractor by trade and that he had built some of the assisted-living facilities later owned and operated by the various entities discussed throughout the trial. The Debtor never claimed and nothing in his attorney's cross-examination of Ms. Boone or her witnesses even

hinted that the Debtor was involved in the day-to-day operations of the assisted-living facilities once they were occupied and operational. The Debtor's many false assertions, paired with the overall carelessness and lack of precision in putting his bankruptcy paperwork together, amounts to a reckless disregard for the truth. The only conclusion to be drawn is that the Debtor knew his statements were false.

The same can be said regarding the Debtor's intent. This is not a case where minor inaccuracies were brought to the Debtor's attention and promptly corrected. Rather, the Debtor dug his heels in and remained steadfast in his false assertions. But he did more than that; when it came time to provide information to Ms. Boone during the pretrial discovery process to support his contentions, he repeatedly and consistently refused.

The Debtor's attorney argued that the inaccuracies in the Debtor's schedules do not show a reckless disregard for the truth but instead showcase the complicated and confusing nature of his financial circumstances. This was evident, he said, from the fact that some of the witnesses at trial mixed up the names and details of the various entities at issue throughout their testimony. To be sure, the factual details of the various, similarly-named entities owned through one or more holding companies are complicated, and some of the witnesses, particularly Ms. Boone, did stumble over the similar names. But the Debtor's attorney's argument is undercut by his client's utter failure to correct or justify the inaccuracies in his bankruptcy papers. *PNC Bank v. Leongas (In re Leongas)*, 628 B.R. 71, 108 (Bankr. N.D. Ill. 2021) (citations omitted)

(explaining that, while not dispositive, efforts to amend or correct errors may be indicative of innocent intent). And, further, this is not a situation where the Debtor was involved and doing business as most of the entities named but just misstated the names of a couple of similar entities. To the contrary, he was not doing business and never had done business operating assisted-living facilities. At most, he held an indirect, minority investment interest in some of the entities. He had no basis to claim that he did business using many of the various entity names, and the Court does not believe that he was confused about that.

Every debtor has an absolute duty to be honest and accurate about himself and his affairs, and, in signing his bankruptcy paperwork and declaring under penalty of perjury that it is true and correct, a debtor is responsible for the information provided. *Id.* at 107; *Drabik v. Drabik (In re Drabik)*, 581 B.R. 554, 563 (Bankr. N.D. Ill. 2018) (citations omitted). Altogether, the misstatements in the Debtor's petition and schedules evidence a "reckless indifference to the truth and the responsibilities of debtors to provide truthful, accurate, and adequate information." *Drabik*, 581 B.R. at 565.

Ultimately, however, the Court does not need to rely solely on circumstantial evidence because, in this case, there is also direct evidence of the Debtor's fraudulent intent. At trial, Ms. Boone identified text messages she said she received from the Debtor a year before he filed for bankruptcy. In those messages, the Debtor explicitly threatened to file bankruptcy to harm Ms. Boone, her business partner, and their business ventures. He made good on

that threat and filed his bankruptcy petition in June 2020, listing Ms. Boone's and her business partners' ventures as his own. With that context, it is clear that the Debtor's false statements were made with fraudulent intent.

### 4. Materiality of the Debtor's Statements.

The remaining required element of proof is that the Debtor's false statements were material. A statement is material "if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Stamat*, 635 F.3d at 982 (citations omitted). "A false oath may be material even though it does not result in any detriment or prejudice to the creditor." *Baccala Realty, Inc. v. Fink (In re Fink)*, 351 B.R. 511, 529 (Bankr. N.D. Ill. 2006) (citation omitted). Generally, "a false statement or omission that has no impact on a bankruptcy case is not material and does not provide grounds for denial of a discharge under §727(a)(4)(A)." *Khalil*, 379 B.R. at 172 (citation omitted). Still, false statements or omissions "that do not affect the value of the estate may nevertheless be material if they hinder the trustee's or creditor's ability to investigate the debtor's pre-bankruptcy dealings and financial condition, even if such an investigation would not have benefited creditors." *784 Café Inc. v. Lang Chin (In re Lang Chin)*, 617 B.R. 761, 768 (Bankr. E.D.N.Y. 2020) (citation omitted). In the bankruptcy context, materiality has a necessarily broad meaning given that the "successful functioning of the Bankruptcy Code hinges both upon the bankrupt's veracity

and his willingness to make a full disclosure." *Lardas v. Grcic*, 847 F.3d 561, 570 (7th Cir. 2017) (quoting *Stamat*, 635 F.3d at 982-83).

Here, the Debtor's false statements clearly satisfy the standard for materiality. While asserting nonexistent property interests did not, strictly speaking, deprive the Debtor's creditors of value that was never really there, such conduct did obfuscate the true nature of the Debtor's financial affairs and did deprive the trustee and creditors of the sort of accurate and dependable information to which they were entitled without engaging in costly investigations.

Further, and importantly, the Debtor's false listing of numerous names under which he claimed to have done business resulted in all of those names being entered into the Court's ECF system. A search of the ECF system now results in all of those entities appearing as debtors in the case. How far this misinformation has spread and what damage it has caused or will cause the entities wrongfully named remains to be seen. The Court cannot, however, find that the false statements were not detrimental to creditors and parties in interest.

In misrepresenting his business interests, the Debtor presented a false financial picture. His false statements in his petition and schedules were material and unquestionably made in connection with his bankruptcy case. Ms. Boone met her burden on the issue of materiality.

### IV.    Conclusion

The purpose of §727(a)(4) is to "ensure that the debtor provides dependable information to those who are interested in the administration of the bankruptcy estate." *Costello*, 299 B.R. at 899 (citations omitted). Complete and candid disclosure is therefore "a condition precedent to the privilege of discharge." *Fink*, 351 B.R. at 525 (citations omitted).

The Debtor made multiple, materially false statements under oath in his bankruptcy petition and schedules by exaggerating his business interests and claiming to be the sole proprietor and operator of business entities that he either did not own at all or in which he held only an indirect, minority interest. The Debtor made the statements knowingly, fraudulently, and with reckless disregard for the truth. He made the false statements for the purpose of harassing and harming Ms. Boone and her business partners. Because Ms. Boone presented evidence sufficient to establish all required elements of proof, her objection to the Debtor's discharge under 11 U.S.C. §727(a)(4)(A) will be sustained. The Debtor's discharge will be denied.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###